**Claude CARTIER**

v.

**SECRETARY OF STATE et al.,**
**Appellants.**

**No. 73–1344.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 22, 1974.

Decided Oct. 30, 1974.

Rehearing Denied Dec. 31, 1974.

Charles Gordon, Gen. Counsel, Immigration and Naturalization Service, Dept. of Justice, of the bar of the Supreme Court of the United States, pro hac vice by special leave of court, with whom Harold H. Titus, Jr., U.S. Atty., at the time the brief was filed, John L. Murphy, Chief, Government Regulations Section, Criminal Division, Dept. of Justice and Richard L. Chaifetz, Atty., Crim. Div., Dept. of Justice, were on the brief, for appellants. John A. Terry, Asst. U.S. Atty., also entered an appearance for appellants.

Lawrence S. Lesser, Washington, D.C., with whom Joseph A. Fannelli, Washingtion, D.C., was on the brief, for appellee.

Before McGOWAN and MacKINNON, Circuit Judges, and A. SHERMAN CHRISTENSEN * United States Senior District Judge for the District of Utah.

McGOWAN, Circuit Judge.

Appellee initiated this action under 28 U.S.C. § 1361 for a writ of mandamus to compel appellants Secretary of State and Commissioner of the Immigration and Naturalization Service to take certain actions with respect to his nationality status. The District Court concluded that a determination of the invalidity of appellee's prior renunciation of nationality, made by the Board of Appellate Review of the State Department, was binding upon all agencies of the federal government; and it accordingly ordered appellants to act in conformity with that determination. Cartier v. Secretary of State, 356 F.Supp. 460 (D.D.C.1973). We have concluded that the District Court erred in so exercising its powers

* Sitting by designation pursuant to Title 28, U.S.Code § 294(d).

as to circumvent the remedy specifically provided by the Immigration and Naturalization Act, and we remand with orders that the action be dismissed without prejudice to the seeking of relief under 8 U.S.C. § 1503.

I

Appellee Claude Cartier, born in Budapest, Hungary, became a naturalized American citizen in 1944 by virtue of his service in the United States Army during World War II. 8 U.S.C. § 1439. At that time, the naturalizing court issued him a certificate of naturalization to evidence this status.

In January of 1964, appellee formally renounced his citizenship before the United States Consulate in Bern, Switzerland, and, upon request, surrendered his certificate of naturalization. Following the Secretary of State's approval of the certificate of loss of nationality executed by the U.S. Consul in Switzerland, id., § 1481, the State Department forwarded to the Department of Justice a copy of the certificate of loss and the surrendered certificate of naturalization.

In 1972 appellee filed a petition for appeal with the State Department's Board of Appellate Review, attempting to nullify his prior renunciation. In proceedings in which the State Department's Passport Office appeared in opposition, appellee presented his version of the events leading to his renunciation, and urged that his action had been an involuntary one thrust upon him by the confluence of events in his personal life.

Appellee's description of these events painted a sympathetic picture of a man who considered himself caught between his desire to remain in Europe to care for his children and his fear that a period of prolonged foreign residence would lead to the loss of his American citizenship. In 1963 appellee's wife filed for divorce and obtained the temporary custody of their two children. Mrs. Cartier was at the time living in Paris, and appellee moved to Europe in order to be near his children, whom he felt to be suffering from parental neglect. Appellee recognized that his foreign residence might pose a threat to his American citizenship, for the reason that Section 352(a) of the Immigration and Nationality Act, 8 U.S.C. § 1484(a), then provided that certain naturalized citizens would lose their citizenship by remaining abroad for a period of three years. Appellee testified that he viewed with apprehension the difficult posture of being motivated, on the one hand, by his desire to remain abroad to care for his children and, on the other, by his knowledge that protracted foreign residence threatened his citizenship status.

Appellee resolved to extricate himself from the horns of this dilemma by excising one of the horns. Thus, after some consideration, and taking into account the cautionary advice of a State Department official that Section 352(a) was then under challenge in the Supreme Court, appellee determined to renounce his citizenship rather than suffer the humiliation of having it taken from him by operation of law.[1]

While not challenging the essence of appellee's relation of the factual events, the Passport Office questioned the sincerity of his perception of the dilemma. It pointed to a number of less drastic means by which appellee could have resolved his problem, and asserted that the failure to pursue these alternatives illustrated that Cartier was really under no compulsion to renounce. The Passport Office characterized his action as a shortsighted but voluntary one that he had later come to regret.

The Board of Appellate Review was, however, persuaded by appellee's description of his emotional stress. It concluded that the renunciation was

---

1. Appellee stated that he considered the possibility that the Supreme Court would invalidate Section 352(a) to be remote. However, that is precisely what the Court did do some four months following appellee's renunciation. Schneider v. Rusk, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1964).

prompted by a "duress of devotion" to his children, and was thus, in legal contemplation, involuntary. Accordingly, the Board held, by reference to the Supreme Court's decision in Afroyim v. Rusk, 387 U.S. 253, 87 S.Ct. 1660, 18 L. Ed.2d 757 (1967), that the 1964 renunciation was not an operative act of expatriation.

Having won what he considered to be an affirmation of his status as an American citizen, appellee petitioned the Department of State for a passport and for the return of the certificate of naturalization he had surrendered pursuant to the 1964 renunciation. Appellee was informed, however, that the State Department had long ago sent his certificate to the Immigration and Naturalization Service of the Department of Justice (INS), and that he would have to seek its return from that agency.

INS refused to return the certificate, stating that it disagreed with the Board of Appellate Review. Thereafter, the State Department's Passport Office informed appellee that it would not issue a passport until the question of the effect of his 1964 renunciation was clarified, and appellee turned to the courts for relief.

Appellee sought mandamus in the United States District Court, seeking to compel the State Department to issue him a passport and INS to return his certificate of naturalization. Shortly after the initiation of this litigation, INS referred the "administrative conflict" to the Attorney General for his resolution.

In its cross-motions for dismissal or for summary judgment, the Government represented that the entire matter had been submitted to the Attorney General and suggested that any judicial ruling prior to the Attorney General's decision would be premature. Shortly thereafter the Attorney General issued an opinion purporting to overrule the State Department. In re Citizenship Determination: Claude Cartier (Feb. 7, 1973), JA 77.

The District Court, characterizing the case as a suit to declare a State Department determination of citizenship binding on all officers and agencies of the United States, felt that the primary question was whether the Attorney General is empowered to overrule State Department determinations of nationality. A related question, in the court's opinion, was whether the quasi-judicial decision of the State Department's Board of Appellate Review was binding on all agencies of the federal government. Cartier, *supra*, at 462. Concluding that the Attorney General lacked such power and that the State Department ruling was *res judicata* for all federal agencies, the court issued an order prohibiting the Secretary from refusing to issue appellee's passport on the ground that he had expatriated himself. The court additionally prohibited the Commissioner of INS from withholding appellee's certificate of naturalization or otherwise impeding the issuance of his passport on grounds of expatriation. The Justice Department thereafter brought this appeal on behalf of both the Commissioner and the Secretary of State.

Appellants' initial brief in this court suggested that the State Department had taken the somewhat perplexing position of urging that its Board of Appellate Review was without jurisdiction to render a decision and that the Board of Review panel that decided the case was improperly constituted. This mystery was subsequently resolved, however, when the Secretary of State obtained the Solicitor General's permission to file his own brief and then moved to be dismissed as a party appellant, asserting that he agreed with the District Court's ruling and that he had fully complied with it.

This court first heard argument on the Secretary's motion for dismissal. At that time, State Department counsel for the Secretary of State informed the court that the Secretary disagreed with the positions advanced on his behalf by the Department of Justice in the Dis-

trict Court and in this court, and disavowed in their entirety the positions urged on his behalf on appeal.[2] Neither counsel for appellant Commissioner nor appellee opposed the Secretary's motion, but we deferred ruling on that question pending receipt of the parties' supplemental memoranda. Both the Commissioner and appellee have again indicated that they do not oppose the Secretary's dismissal as an appellant, and we so order.

## II

The parties on appeal essentially have adopted the District Court's view of the controlling questions of law, and thus have devoted most of their efforts to supporting or refuting the District Court's opinion. Thus, the case laid before this court presents broad and important questions concerning the scope of the Attorney General's power to make controlling determinations of law under the Immigration and Naturalization Act, and the applicability of the doctrine of administrative *res judicata* to the prior ruling of the State Department's Board of Appellate Review.

Neither of these issues is a simple one. The Immigration and Naturalization Act denominates the Attorney General as the principal federal officer in charge of immigration and nationality laws within the United States. Section 103(a) of the Act states, in relevant part:

The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the . . . Secretary of State . . . .

8 U.S.C. § 1103(a).

Section 104(a) of the Act, in turn, provides that the Secretary of State "shall be charged with the administration and enforcement of the provisions of this chapter and all other immigration and nationality laws relating to . . . the determination of nationality of a person not in the United States." 8 U.S.C. § 1104(a). Finally, the Act provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." *Id.* § 1103(a).

Reviewing the State Department determination, the Attorney General concluded that the Board's decision would not bind the Attorney General on questions of law or fact in light of his plenary authority over the issues involved in the case. Additionally, he determined that the opinion of the Board of Appellate Review had no operative effect because the Board lacked a proper quorum at the time it rendered its decision. The Attorney General finally determined that appellee had failed to overcome the presumption that his act of expatriation

---

2. This curious situation derives from the fact that 28 U.S.C. §§ 516 and 519 denominate the officers of the Department of Justice to represent the United States or agencies or officers thereof in the conduct of litigation. In this case, it appears that the Justice Department determined that the views of the Attorney General and the Commissioner were correct, and, notwithstanding State Department disagreement, represented those positions as the views of both the Secretary and the Commissioner. The Secretary of State stood by silently in the District Court and nonetheless saw his true position vindicated. After having been enlisted to attempt to reverse his "loss" in the District Court, the Secretary took steps to make his position known to this court.

Both the Secretary and appellee have questioned whether Sections 516 and 519 authorize the Attorney General to impose his view upon another federal agency in the course of his representation of that agency. Our determination to grant the Secretary's unopposed motion for dismissal moots this question.

After hearing argument on his motion to be dismissed as an appellant, this court requested that the Secretary of State provide us his views on the merits of the appeal. The Secretary has complied with that request, and his view of the governing law corresponds generally with that of appellee Cartier.

was voluntary and that, as a matter of law, appellee's allegations of conflicting loyalties were insufficient to support a claim that the renunciation was the product of duress. In re Citizenship Determination: Claude Cartier, (Feb. 7, 1973), JA at 77.

The District Court ruled that the Attorney General's power to render controlling opinions on matters of law was limited to statutory interpretations of prospective and general application, and thus concluded that the Attorney General's opinion did not in any way diminish the effect of the State Department ruling. That position is certainly not without force. However, the result is not clearly mandated either by the statute or by the legislative history cited by the District Court. The Commissioner's arguments to the contrary are equally problematical. His interpretation of the scope of the Attorney General's power to make controlling determinations of law sweeps broadly. We find particularly troublesome the Commissioner's assertion that the Attorney General's authority to rule on questions of law encompasses the power to determine whether sufficient evidence exists to support a State Department determination of involuntariness in a particular case. While every factual issue perhaps contains an underlying legal determination that a given quantum of facts would enable the factfinder to reach a particular conclusion, acceptance of that rationale in justification of the Attorney General's actions in this case would appear to grant him the power to reconsider and

overrule all State Department determinations by a sufficiency of the evidence standard. This would indeed be a unique structure of administrative review, and one would think that Congress might have spelled out more clearly a purpose on its part to encompass it. *Cf.* S & E Contractors v. United States, 406 U.S. 1, 20, 92 S.Ct. 1411, 31 L.Ed.2d 658 (Blackmun, J., concurring).

The question of the applicability of the doctrine of administrative *res judicata* to determinations made pursuant to the Immigration and Nationality Act is likewise a complex and difficult question. While the doctrine of administrative *res judicata* has in recent years found increasing acceptance in some areas of administrative law, [3] it has not evolved into a rigid system that is to be blindly applied in every context. As Professor Davis recently observed, "[t]he sound view is . . . to use the doctrine of res judicata when the reasons for it are present in full force, to modify it when modification is needed, and to reject it when the reasons against it outweigh those in its favor." K. Davis, Administrative Law Text, § 18.-02, at 360 (1973). This view has obtained support in the case law. *See e. g.,* United States v. Smith, 482 F.2d 1120, 1123 (8th Cir. 1973); Tipler v. E. I. du Pont de Nemours & Co., 443 F.2d 125, 128 (6th Cir. 1971); *cf.* Title of Immigration and Naturalization Service, 322 F.2d 21, 25 n. 11 (9th Cir. 1963)

The Immigration and Nationality Act is silent on the question of the kind of impact that a State Department deter-

---

3. The progress of judicial acceptance of the doctrine of administrative *res judicata* can be seen by examination of the writings of Professor Kenneth Culp Davis. In 1958, Professor Davis devoted considerable effort to demonstrating the unsoundness of judicial statements refusing to apply the doctrine of *res judicata* to administrative proceedings. 2 K. Davis, Administrative Law Treatise, § 18.02, at 548–557 (1958). By 1973 the applicability of *res judicata* to certain administrative proceedings had become an accepted principle of federal law as well as an increasingly accepted notion in the state courts, and Professor Davis no longer felt

compelled to defend the validity of the general proposition with such vigor. K. Davis, Administrative Law Text, § 18.02, at 360 (1972).

It would appear that the rapid sweep of the law may have left the Commissioner behind. The cases that he cites in support of his argument that *res judicata* is ordinarily inapplicable to administrative determinations have been largely discredited by the Supreme Court. *See* United States v. Utah Construction & Mining Co., 384 U.S. 394, 421, 422, n. 19, n. 21, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

mination of this kind should have on other federal agencies charged with administration of the Act. As previously noted, the Act vests in the Attorney General the primary responsibility for enforcement of the immigration and nationality laws in the United States, and the Secretary of State is charged with similar responsibilities in relation to nationality determinations of persons not in the United States.

It is apparent from the bifurcation of responsibilities that each agency will be called upon to address similar issues in different contexts. For example, the State Department's issuance of a passport must reflect its determination that the recipient is a national of the United States.[4] However, INS must decide whether a person presenting himself at the border is entitled to entry. Since the statute only authorizes exclusion of aliens, 8 U.S.C. § 1226, whom it defines as persons who are neither citizens or nationals of the United States, *id.* § 1101(a)(3), an INS decision to exclude an alien must in some cases reflect disagreement with the prior State Department determination of nationality. In this context, the initial State Department determination of nationality required for the issuance of a passport has not been held to preclude an independent INS assessment of the matter. *See* Yee v. Barber, 210 F.2d 613 (9th Cir.), cert.

denied, 347 U.S. 988, 74 S.Ct. 850, 98 L. Ed. 1122 (1954); In re Wing, 124 F. Supp. 492 (N.D.Cal.1954).

Similar administrative disagreement over the question of nationality has arisen in the context of deportation proceedings, and again a prior State Department decision has not barred the INS's exercise of independent judgment on the question of nationality. Thus in Montana v. Rogers, 278 F.2d 68 (7th Cir. 1960), aff'd, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), the court of appeals concluded that a prior State Department indication of nationality and the INS's acquiescence in that determination by admitting appellant into the United States did not preclude subsequent deportation proceedings upon INS's realization that the earlier nationality determination had been erroneous.

Neither has the State Department always considered itself bound by a previous INS determination of nationality. For example, the controversy that led to litigation in Lung v. Dulles, 261 F.2d 719 (9th Cir. 1954), occurred when the State Department refused to issue a passport on the basis of its independent conclusion of non-nationality, notwithstanding a prior favorable ruling on that issue made by INS in connection with an inquiry over admissibility into the country.[5]

---

4. 22 U.S.C. § 212 provides that passports shall issue only to "those owing allegiance, whether citizens or not, to the United States." The Attorney General has interpreted allegiance to mean *permanent* allegiance, 26 Op.Atty.Gen. 376 (1907), and thus the State Department determination in issuing a passport is the equivalent of decision that the recipient is a "national of the United States." 8 U.S.C. § 1101(a)(22).

5. The position taken by the Attorney General in In re Flegemheimer, 41 Op.Atty.Gen. 452 (1960), would appear to preclude the recurrence of this type of case. There the State Department, feeling that a prior INS determination of citizenship and grant of a certificate of citizenship was erroneous, chose to take its position to the Attorney General rather than to refuse to issue a passport on the basis of its own determination of non-

nationality. It requested the Attorney General to compel INS to initiate proceedings for cancellation of the certificate.

Interestingly, the Attorney General's opinion was that the INS issuance of the certificate of citizenship compelled State to consider Flegemheimer a citizen. In parts of his opinion, the Attorney General speaks in general terms of the applicability of administrative *res judicata. See id.* at 460. However, the opinion primarily rests on Section 332(e) of the Immigration and Nationality Act of 1952, which states that in all public offices of the United States a certification of citizenship should have the same effect as a certificate of naturalization issued by a court. 8 U.S.C. § 1443(e). This, in the opinion of the Attorney General, precluded collateral administrative inquiry into the facts underlying the issuance of the administrative document, except in a Justice De-

The cited cases were decided prior to the general judicial acceptance of the applicability of *res judicata* to administrative proceedings, and thus cannot be considered definitive statements of the issue. However, the cases do serve to illustrate that both the Department of State and INS have felt at liberty to make independent nationality determinations in instances in which the exercise of their statutory responsibilities requires a judgment on that question. This pattern generally seems to support characterizations of the immigration and naturalization system as a "double check" system in which important issues of nationality might be considered in more than one forum. *See* Besterman, "Commentary on the Immigration and Nationality Act," 8 U.S.C.A. (1953 ed.) 1, at 46.[6]

### III

Apart from the difficulty these issues present conceptually, their resolution could have a most significant impact on the administration of the immigration and nationality laws. The District Court's holding that the State Department determination of nationality binds other federal agencies would constitute a major change in the present enforcement structure of this body of law, as would endorsement of the broad interpretation of the Attorney General's powers here offered by appellant Commissioner. We find it unnecessary and indeed unwise to attempt to resolve these questions in the context of this proceeding, for a much more sensible statutory remedy exists for the disposition of the underlying dispute in this case. That procedure is the action for a judicial declaration of nationality.

Section 360 of the Immigration and Nationality Act provides that any person within the United States who is denied a right or privilege of nationality by any United States department can initiate an action under 28 U.S.C. § 2201 for a judicial declaration of nationality.[7] Certainly the actions of the Commission-

---

partment proceeding to revoke the certificate.

**6.** As the legislative history of the Immigration and Nationality Act reveals, Congress was aware of the possible confusion and hardship that could result from the multiplicity of control, but concluded that that was an acceptable price to pay for effective control of alien admissions:

> Among the principal points of criticism aimed at the immigration structure has been the contention that the multiplicity of control by several agencies of various immigration activities should be eliminated. In general, the subcommittee has come to the conclusion that, although there are some points in the mechanism where coordinated action is necessary and duplication must be eliminated, the over-all structural pattern ought to be maintained. The subcommittee is persuaded to the position on the grounds that (1) the distribution of responsibility places additional barriers in the way of undesirable aliens, additional fences of protection which the alien must surmount, and (2) the present system operates satisfactorily and the suggested modifications will eliminate most of the existing difficulties.

S.Rep.No.1515, 81st Cong., 2d Sess., 332 (1950). The Special Subcommittee to Investigate Immigration and Naturalization, author of the report, considered and rejected a proposal advanced by the Hoover Commission to transfer the Visa Division of the Department of State to the Justice Department in order more effectively to centralize control. The subcommittee decided to recommend continuation of the bifurcation of power to maintain "an additional barrier to the entry of inadmissible aliens," *id.* at 327, 331, feeling that most of the problems presented by the dual system could be corrected by improving the consular officers' knowledge of the standards applied by INS, *id.* at 333. Moreover, the subcommittee considered the problem of the issuance of passports to be closely related to those presented in the issuance of visas. *Id.* at 331.

Senator McCarran introduced a bill reflecting these views in the 81st Congress, but the measure was committed for further study. The 82nd Congress thereafter drew upon the previous experience in enacting its sweeping reform of the immigration and naturalization laws. *See* H.Rep.No.1365, 82nd Cong., 2d Sess., 27 (1952). Among the ideas expressed by the Senate report that carried over into the 1952 legislation is the desire to provide more thorough screening of aliens. *Id.* at 52.

**7.** The Supreme Court's decision in Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962), makes this remedy equally available to persons not within the United States.

er sufficed to warrant appellee's invocation of this remedy. He chose instead to seek to compel the return of his certificate of naturalization by resort to writ of mandamus—an extraordinary judicial remedy at best—consistently maintaining that he was not seeking a judicial determination of nationality.

A realistic appraisal of the District Court's ruling on the *res judicata* effect of the Board of Appellate Review's determination suggests that appellee did in fact win the essential equivalent of a judicial declaration of nationality, for the rationale of the District Court opinion seems to preclude any administrative action that reflects disagreement with the Board's determination of the invalidity of appellee's renunciation. Rather than obtaining a positive judicial ruling on the question of his nationality, appellee seems to have won a judicial prohibition against administrative assertion of non-nationality. The Attorney General and the Commissioner, in an obvious attempt to avoid circumscription of INS's authority over immigration matters, have advanced arguments that appear to place the Attorney General in a position of exercising appellate review over the Department of State.

Congress, in determining to perpetuate the double check system in the administration of the immigration and nationality laws, *see* note 6, *supra*, obviously did not intend to promote such inter-necine warfare. Nor do we think that the federal judiciary should permit the enlistment of its own powers to that end when a more appropriate statutory alternative exists.

██ Mandamus is an extraordinary remedy to be utilized only in the clearest and most compelling cases. The exercise of the power of mandamus is a matter committed to the sound discretion of the court, Whitehouse v. Illinois Cent. R. Co., 349 U.S. 366, 75 S.Ct. 845, 99 L.Ed. 1155 (1955), and the remedy is to be restricted to exigent circumstances.[8] One critical consideration in determining the propriety of resort to a writ of mandamus is the question of alternative remedies; the writ is usually denied when such alternatives exist. Ex Parte Republic of Peru, 318 U.S. 578, 584, 63 S. Ct. 793, 87 L.Ed. 1014 (1943). Moreover, the alternative remedies that might call for refusal to resort to writ of mandamus encompass judicial remedies, Carter v. Seamans, 411 F.2d 767 (5th Cir. 1969), cert. denied, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); Whittier v. Emmet, 108 U.S. App.D.C. 191, 281 F.2d 24, 28 (1960), cert. denied, 364 U.S. 935, 81 S.Ct. 380, 5 L.Ed.2d 367 (1961); Clark v. Memolo, 85 U.S.App.D.C. 65, 174 F.2d 978, 980 (1949), as well as administrative ones, Beale v. Blount, 461 F.2d 1133 (5th Cir. 1972); Tarlton v. Clark, 441 F.2d 384 (5th Cir.), cert. denied, 403 U.S. 934, 91

8. This court summarized the basic principles governing the availability of the writ of mandamus as follows:
(1) The writ should be used only when the duty of the officer to act is clearly established and plainly defined and the obligation to act is peremptory. (2) The presumption of validity attends official action, and the burden of proof to the contrary is upon one who challenges the action. (3) Courts have no general supervisory powers over the executive branches or over their officers, which may be invoked by writ of mandamus. Interference of the courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief. (4) When the per-formance of official duty requires an interpretation of the law which governs that performance, the interpretation placed by the officer upon the law will not be interfered with, certainly, unless it is clearly wrong and the official action arbitrary and capricious. (5) For it is only in clear cases of illegality of action that courts will intervene to displace the judgments of administrative officers or bodies. (6) Generally speaking, when an administrative remedy is available it must first be exhausted before judicial relief can be obtained, by writ of mandamus or otherwise. Hammond v. Hull, 76 U.S.App.D.C. 301, 131 F.2d 23, 25 (1942), cert. denied, 318 U.S. 777, 63 S.Ct. 830, 87 L.Ed. 1145 (1943) [citations omitted].

S.Ct. 2263, 29 L.Ed.2d 713 (1971); Bolger v. Marshall, 90 U.S.App.D.C. 30, 193 F.2d 37 (1951).

In the instant case the alternative of a judicial declaration of nationality under 8 U.S.C. § 1503 is more than adequate to provide appellee all the relief he has sought by mandamus. Moreover, this statutory remedy can respond to appellee's grievances in a manner potentially less destructive of the overall allocation of powers between the Department of State and INS. Indeed, examination of the structure of the Act suggests that the statutory remedy was intended for cases of precisely this kind. Mandamus, therefore, is not an appropriate remedy in this case.

Nor do we think that the problem of remedies can be avoided by characterizing the District Court opinion as a form of declaratory relief rather than mandamus.[9] Although the existence of alternative forms of relief is not an automatic bar to the award of declaratory relief, *see* Powell v. McCormack, 395 U.S. 486, 517–518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the court, in the exercise of discretion, can refuse to grant declaratory relief if alternative remedies are better or more effective. Cunningham Bros. Inc. v. Bail, 407 F.2d 1165 (7th Cir.), cert. denied, 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969); Davis v. Board of Parole, 113 U.S.App.D.C. 194, 306 F.2d 801 (1962); Gordon v. Matthews, 106 U.S.App.D.C. 400, 273 F.2d 525 (1959), cert. denied sub nom. Frazier v. United States, 363 U.S. 813, 80 S.Ct. 1251, 4 L.Ed.2d 1155 (1960). The very same factors that indicate the impropriety of resort to mandamus reveal that the District Court should not entertain the type of action for declaratory relief that appellee claims was here granted.[10]

We thus conclude that the District Court erred in proceeding with the action in the manner here presented. The Immigration and Nationality Act provides a specific form of relief for persons claiming to have been improperly denied rights owed them as nationals of the United States—one that can both afford aggrieved persons total relief and at the same time minimize judicial intrusion into the administrative decision-making processes. The District Court's provision of an alternative path to the same goal was erroneous.

The motion by the Secretary of State to dismiss his appeal is granted, and the case is remanded to the District Court with instructions to dismiss appellee's petition without prejudice to the renewal of an action in the appropriate forum under the provisions of 8 U.S.C. § 1503.

It is so ordered.

9. Although the action was brought as a petition for writ of mandamus, the District Court characterized the case as an action to declare the State Department determination binding on all federal agencies and combined a ruling to that effect with orders running against appellant Commissioner and against the Secretary of State. Appellee responded to appellant's assertion that mandamus was inappropriate simply by stating that it was not granted, and thus that that was not an issue on appeal.

Examination of the District Court opinion does not indicate whether it consciously abandoned mandamus for another form of relief. Our disposition makes it unnecessary to resolve that question.

10. Since the Secretary of State, by his own motion and with the consent of all parties, has withdrawn as an appellant in this case, we find it unnecessary to consider whether either mandamus or declaratory relief would be a permissible alternative remedy when one branch of the State Department refused to comply with a ruling issued by another branch of that same agency.