**Lloyd T. DANIELSEN, et al., Plaintiffs,**

*v.*

**Elizabeth DOLE, et al., Defendants.**

**Civ. A. No. 89–3143.**

United States District Court,
District of Columbia.

Aug. 28, 1990.

Charles Edward Raley, James Scott Phillips, Michael Robert Hatcher, Israel & Raley, Chartered, Washington, D.C., for plaintiffs.

Susan Ann Nellor, Asst. U.S. Atty., Washington, D.C., for Government.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This case involves the application of the McNamara–O'Hara Service Contract Act, as amended, 41 U.S.C. § 351 *et seq.*, to five United States Department of Navy ("Navy") service contracts awarded variously to the Burnside–Ott Aviation Training Center, Inc. ("Burnside–Ott") and the Dynalectron Corporation, now known as DynCorp ("DynCorp"). In this action, representative plaintiffs Lloyd T. Danielsen, David W. King, and Jack Wagstaff[1] seek a writ of mandamus to compel the Secretary

of Labor and the Secretary of the Navy to issue and enforce retroactive wage determinations against plaintiffs' former employers, Burnside–Ott and DynCorp. Currently pending before the Court is defendants'[2] motion to dismiss.

## Background

The five service contracts at issue in this case are three maintenance service contracts for the Navy's TH–57 helicopter training squadrons based in Florida and two maintenance service contracts for the Navy's T–34/44, and T–2 aircraft training squadrons based throughout the southern United States. The seeds of the present dispute were sown in November, 1985, when plaintiffs David King and Lloyd Danielsen filed a complaint with the regional office of the United States Department of Labor's Wage and Hour Division ("Wage and Hour Division") concerning the performance of the Navy's three contracts for maintenance of its TH–57 helicopter aircraft.

Prior to 1981, the Navy performed its own maintenance services for its TH–57 helicopter aircraft. On September 28, 1981, the Navy contracted out the maintenance services for its TH–57 helicopters to Burnside–Ott. Burnside–Ott continued to hold this contract, the first of the three TH–57 contracts at issue, under option until December 1, 1984 (Contract No. N00612–81–C–8007, "B–O Contract # 1"). Complaint, ¶¶ 16–17, 23. *See also* Affidavit of William W. Gross, Acting Assistant Administrator, Office of Program Operations ("Gross Aff.") ¶ 4, attached as Exhibit to Defendants' Motion to Dismiss. From December 1, 1984, until December 1, 1985, the TH–57 contract was performed by Dynalectron Corporation, now known as DynCorp (Contract No. N00612–84–C–8002, "DynCorp Contract # 1"). Complaint, ¶ 32; Gross Aff., ¶ 4. On December 1, 1985, Burnside–Ott began performance on the

---

1. Plaintiffs' Motion for an Order Certifying that the Action May Proceed as a Class Action is still pending.

2. On February 12, 1990, the Court granted DynCorp's motion to intervene as a defendant. Subsequently, DynCorp filed a motion to dismiss or in the alternative for summary judgment. For the sake of clarity, the Court uses the term "federal defendants" to refer to the Secretary of Labor and the Secretary of the Navy.

third TH–57 maintenance contract (Contract No. 68520–86–D–0101, "B–O Contract # 2") which it reacquired pursuant to competitive bid. Complaint, ¶ 27; Gross Aff., ¶ 4. Burnside–Ott continues to hold this contract through the present time.[3] *Id.*

As a result of plaintiffs' complaint concerning the TH–57 service contracts,[4] the Wage and Hour Division investigated the payment practices of the contractors on the TH–57 contract. Gross Aff., ¶ 5. In a report dated February 19, 1986, the Division determined that the Service Contract Act ("SCA") had been violated. *Id.* In particular, the Division concluded that Burnside–Ott was utilizing a system of job classification for its employees on B–O Contract # 2 that resulted in misclassifications and the underpayment of wages required for the nature of the work performed.[5] Complaint, ¶ 25; Gross Aff., ¶ 5. No enforcement action was taken at that time, however.

Instead, on May 20, 1986, Burnside–Ott submitted to the Navy a proposed conformance action requesting the addition of 14 classes of service employees to the wage determinations on B–O Contract # 2. Complaint, ¶ 75; Gross Aff., ¶ 7. Under Department of Labor ("DOL") regulations, when the performance of a contract requires the employment of a class of service employee not listed on the wage determination, the contractor must classify such employee "so as to provide a reasonable relationship (i.e. appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination." 29 C.F.R. § 4.6(b)(2)(i). Such a "conformance action" is subject to the approval of the Administrator of the Wage and Hour Division. In its proposed conformance action, Burnside–Ott asserted that various technician classes not on the wage determination were neces-

sary to the performance of the TH–57 contract and proposed that these classifications be paid at wage rates lower than the aircraft worker classification wage rate listed on the wage determination. Gross Aff., ¶ 7.

On December 15, 1986, the Administrator of the Wage and Hour Division determined that no conformance was necessary. Gross Aff., ¶ 9. The Administrator concluded that the duties of employees in the proposed "technician" classifications fell within those of the aircraft worker as described in the wage determination and, therefore, employees performing work under such classifications must be paid no less than the aircraft worker rate on the wage determination. The Administrator made similar determinations with respect to other proposed classifications. For those proposed classifications that did not match the duties of a classification on the wage determination, the Administrator used the "standard slotting methodology" to determine appropriate pay ratios between the requested classifications and those contained in the wage determination. *Id.*; 29 C.F.R. §§ 4.6(b)(2)(iv)(A) and 4.51(c).

On February 11, 1987, the Wage and Hour Division directed Navy to withhold amounts from contract funds to secure back wages owed by Burnside–Ott while the matter was under consideration by Labor. Specifically, the Division requested that $826,000 be withheld from contract funds and that an additional $59,000 per month be withheld to cover Burnside–Ott's on-going liability. By letter dated March 30, 1987, the Navy confirmed that it was withholding funds. Gross Aff., ¶ 11. On April 21, 1987, Burnside–Ott submitted a request to stay withholding of contract funds pending review of Navy's request for reconsideration of the Administrator's

3. In 1986, Burnside–Ott was purchased by United Nuclear Corporation ("UNC").

4. Both plaintiffs King and Danielsen worked on B–O Contract # 1 and Dyncorp Contract # 1, but not on B–O Contract # 2. Complaint, ¶¶ 39–42. Plaintiff Wagstaff worked on all three TH–57 contracts. *Id.* at ¶¶ 48–52.

5. Apparently, the violations arose as a result of Burnside–Ott's misclassification of the employees performing much of the service and repair work as "technicians" (*e.g.,* phase maintenance technician, power plant technician) rather than as more highly paid "aircraft workers" (*e.g.,* aircraft mechanic, aircraft worker).

determination. This request was denied.[6] Gross Aff., ¶ 12.

On May 25, 1987, Navy requested review and reconsideration of the Administrator's conformance determination on the grounds that the lower paid technician classification rather than the aircraft worker classification was the primary classification required on the contract. Gross Aff., ¶ 10. The Administrator rejected the Navy's position on December 4, 1987. The Administrator based her decision on the determination that aircraft workers are better suited than technicians to perform inspection and repair of aircraft in operation, as required by the maintenance service contract, because unlike technicians, aircraft workers are qualified to work directly on aircraft and possess knowledge to recognize on the flight-line what repairs are necessary.[7] *Id.*

Burnside–Ott then petitioned the Deputy Secretary of Labor for review of the Administrator's conformance decisions of December 15, 1986, and December 4, 1987 pursuant to 29 C.F.R. § 8.7(b). Case No. 87–SCA–OM–2; Gross Aff. ¶ 14. Plaintiffs King and Danielsen participated as interested parties, pursuant to DOL regulations, by submitting exhibits and statements in support of the Administrator's determination. *See* 29 C.F.R. § 8.11; Gross Aff. ¶ 13. On January 10, 1989, the Deputy Secretary issued a final decision affirming the Administrator's conformance decisions regarding B–O Contract # 2 in their entirety and directing that Burnside–Ott's employees be paid the wage rates as determined by the Administrator retroactive to December 1985, the date when the contract commenced. Gross Aff., ¶ 14.

Subsequently, the Wage and Hour Division demanded payment of back wages from Burnside–Ott for B–O Contract # 2. Gross Aff., ¶ 15. To date, Burnside–Ott has distributed approximately $960,000 to employees in underpaid wages owed for the periods from December 1985 to September 1987.[8] Gross Aff., ¶ 16. Because the violations concerning B–O Contract # 2 were alleged to have carried over from previous TH–57 contract periods, the Wage and Hour Division, pursuant to its standard practice, is also seeking back wages for the two-year period preceding its February 1986 investigation. Thus, DynCorp has acknowledged its liability for back wages for DynCorp Contract # 1, which covers the period December, 1984 to December, 1985, although exact amounts have not as yet been computed. The Wage and Hour Division is also seeking to obtain further back wages from Burnside–Ott for the period from February 1984 to December 1984.[9] Gross Aff., ¶ 17.

---

6. On August 9, 1987, however, the Wage and Hour Division agreed to accept a letter of credit from Burnside–Ott in lieu of withholding contract funds. The Navy was authorized to release the withheld funds and to cease the monthly withholding. The amount of the letter of credit was periodically increased in order to cover Burnside–Ott's on-going liability. Gross Aff., ¶ 12.

7. The Administrator further determined that based on the description of duties of the technician classifications contained in the Service Contract Act Directory of Occupations, the duties of technicians do not encompass actual flight-line aircraft maintenance, but rather are performed in a research and development setting. Gross Aff., ¶ 10.

8. In March, 1989, Burnside–Ott brought its classification practices into compliance with the Administrator's determination. Thus, Burnside–Ott remains liable of the period between October, 1987 to March, 1989. The Wage and Hour Division estimates this amount to be $795,000. Gross Aff., ¶ 16.

9. While UNC, the current owner of Burnside–Ott, apparently disputes its liability for back wages prior to the time it purchased Burnside–Ott, discussions are currently underway with the Wage and Hour Division. The Division has taken the position that UNC is responsible for the prior back wage liabilities incurred by Burnside–Ott. William Gross, the Acting Assistant Administrator of the Division, has indicated that should UNC continue to deny its responsibility for back wages prior to 1986, the Division intends to issue a ruling on this matter, which would be appealable to the Deputy Secretary by any aggrieved party, or to refer this matter to the Department's Office of the Solicitor for the filing of an administrative complaint to recover the back wages owed. Supplemental Affidavit of William W. Gross ("Supp. Gross Aff."), ¶ 13, attached as an exhibit to Federal Defendant's Opposition to Representative Plaintiffs' Motion for an Order Certifying that the Action May Proceed as a Class Action.

The remaining two contracts at issue in the present dispute were awarded to Dyn-Corp by the Navy for the maintenance of its T–2 and T–34/44 fixed wing aircraft, respectively. The T–2 maintenance services contract was awarded to DynCorp on February 4, 1985 (Contract No. N68520–85–D–9053, "DynCorp Contract #2"). Complaint, ¶ 33; Gross Aff., ¶ 18. The T–34/44 maintenance service contract was awarded to DynCorp on September 22, 1985 (Contract No. N68520–85–D–0033, "DynCorp Contract #3"). Complaint, ¶ 35; Gross Aff., ¶ 18. DynCorp submitted a conformance request for each contract, proposing rates for numerous classifications not contained on the wage determinations. The two conformance requests were consolidated for consideration by the Administrator, who issued a final ruling on April 3, 1987. Gross Aff., ¶ 19.

Once again, as with the TH–57 contracts, the primary dispute was the contractor's proposed use of technician classifications to perform aircraft maintenance on the flightline. While the Administrator accepted the classifications proposed by DynCorp, she also increased most of the proposed wage rates for the classifications and directed DynCorp to apply these conformed wage rates to the commencement date of the applicable contract. Gross Aff., ¶ 19. On May 28, 1987, DynCorp petitioned the Deputy Secretary for review of the Administrator's determination. Case No. 87–SCA–OM–5; Gross Aff., ¶ 20.

On December 3, 1987, the Navy requested that the Deputy Secretary consolidate DynCorp's appeal in Case No. 87–SCA–OM–5, concerning the T–2 and T–34/44 contracts, with Burnside–Ott's appeal in Case No. 87–SCA–OM–2, concerning the TH–57 contract. Gross Aff., ¶ 20. The Administrator opposed consolidation, and plaintiffs King and Danielsen submitted a response supporting consolidation of the two appeals.[10] On May 5, 1988, the motion to consolidate was denied. Id.

During this same time frame, DynCorp and the Navy provided additional job information to DOL and DOL representatives conducted on-site inspections of DynCorp's operations. Supp. Gross Aff., ¶ 2. Thereafter, DOL, DynCorp, and the Navy agreed upon a revised classification and wage rate structure to apply to DynCorp's two current contracts for the maintenance of the Navy's T–2 and T–34/44 fixed wing aircraft (DynCorp Contracts #2 and #3). Id. As a result, in September, 1988, DOL issued new wage determinations for Dyn-Corp Contracts #2 and #3 reflecting the agreed upon classification structure.[11] Id. Although these wage determinations applied retroactively to the beginning of the contract period for the fiscal year 1988,[12] they did not apply to earlier years. Id. The Administrator's conformance ruling of April 3, 1987, which applied to fiscal years 1985 and 1986, remained on appeal to the Deputy Secretary of Labor.

However, on January 23, 1989, DynCorp moved to stay the proceedings in its appeal pending settlement discussions between the parties. Gross Aff., ¶ 22. On February 24, 1989, the Deputy Secretary granted a 60 day stay. Id. Subsequently, by letter dated March 8, 1989, plaintiffs King and Danielsen requested permission to intervene as interested parties in the DynCorp appeal. Gross Aff., ¶ 21. This request was opposed by DynCorp on the grounds that it

---

**10.** Although none of the named plaintiffs worked on DynCorp Contract #2, plaintiff King did work on DynCorp Contract #3 from the commencement of the contract until August, 1986. Complaint, ¶ 4; Gross Aff. ¶ 18.

**11.** The revised wage determination maintain the "aircraft mechanic" and "aircraft worker" classifications as the benchmark classification performing the maintenance and repair work in the contracts. However, certain support classifications, such as the "warehouseman" classification, were altered under the revised wage determination so as to maintain consistency among the classifications within the rate structure. Supp. Gross Aff., ¶ 3.

**12.** DynCorp has computed, and the Wage and Hour Division has approved, approximately $9 million in back wages for fiscal years 1988 and 1989. Gross Aff., ¶ 26. DynCorp has already distributed approximately six of the nine million dollars it owes in back wages for those two fiscal years. Gross Aff., ¶ 27. The remainder of the payments for fiscal years 1988 and 1989 are pending the Navy's audit and approval of Dyn-Corp's contract modifications. Id.

was untimely.[13] *Id.* DynCorp filed a motion to further stay proceedings on April 20, 1989, in order to continue settlement negotiations. Gross Aff., ¶ 22. This motion was apparently granted.

As a result of the ongoing settlement negotiations, DOL and DynCorp have agreed in principle that the current classification and wage rate structure could form a more appropriate basis for the back wage calculations than the classification and wage rate structure ordered by the Administrator in the 1987 conformance ruling. Supp. Gross Aff., ¶ 4. If the Wage and Hour Division approves DynCorp's computation of back wages for contract years 1985 and 1986 based upon the classification and wage rate structure utilized for the 1988 wage determinations, the Acting Administrator intends to withdraw the 1987 conformance ruling and request that the Deputy Secretary remand the matter for a new conformance ruling. Supp. Gross Aff., at ¶ 5. The Administrator would then issue a new conformance determination applicable to contract years 1985 and 1986, which would again be subject to appeal to the Deputy Secretary of Labor "by any aggrieved party" pursuant to 29 C.F.R. § 8.7(b). *Id.* If the Wage and Hour Division does not approve DynCorp's back wage computation for contract years 1985 and 1986, DOL intends to request that the Deputy Secretary lift the stay of proceedings and decide the merits of DynCorp's appeal. Supp. Gross Aff., ¶ 6. Should the Deputy Secretary affirm the Administrator's 1987 conformance ruling, DOL would then enforce the conformance ruling by seeking to collect back wages owed by DynCorp. *Id.*

On November 2, 1989, the Deputy Secretary requested that the parties submit a status report on the settlement negotiations within 30 days. *Id.* Plaintiffs commenced the action presently before the Court on November 20, 1989. As a result, DynCorp subsequently moved for an extension of time within which to file the status report requested by the Deputy Secretary of Labor. Gross Aff., ¶ 22. By order dated January 5, 1990, the Deputy Secretary again stayed the proceedings. *See* Order of Deputy Secretary of Labor dated February 15, 1990, at 1, attached to Defendants' February 16, 1990 Report to the Court.

On February 15, 1990, the Deputy Secretary ruled on plaintiffs King and Danielsen's motion to intervene in the DynCorp appeal. *Id.* Although the Deputy Secretary denied plaintiff's motion, thereby denying them the right to participate in all negotiations or discussions between the parties, he also "perceive[d] as integral to informed decisionmaking that [he] be apprised of possibly helpful views on a given issue." *Id.* at 13. Accordingly, the Deputy Secretary permitted plaintiffs, for those service contracts under which they were employed, to submit their views regarding the merits of the administrative conformance determinations at issue. In addition, the Deputy Secretary directed the parties to serve plaintiffs Danielsen and King, and their counsel, with all filings in the DynCorp case.

Plaintiffs seek a writ of mandamus from this Court compelling the Secretary of Labor and the Secretary of the Navy to comply with the Service Contract Act and to enforce the provisions of the Act.[14] Specifically, plaintiffs seek to compel an immediate determination of the amount of underpayment to each employee under the five service contracts at issue; reimbursement by Burnside–Ott, UNC Support Services, Inc., UNC, Inc., and DynCorp of the underpaid amount, plus interest and the costs of this proceeding, including reasonable attorney's fees; withholding of the amounts due from federal contract funds; and the establishment of a trust under the Court's supervision to administer the funds withheld and recovered for the benefits of the employees. Complaint at 33–34.

---

**13.** As discussed *infra,* the Deputy Secretary of Labor did not rule on plaintiffs' motion to intervene in the DynCorp appeal until after this lawsuit was filed, almost one year later.

**14.** The Complaint consists of two counts: Count I presents a claim for a writ of mandamus to the Secretary of the Navy; Count II presents a claim for a writ of mandamus to the Secretary of Labor.

Discussion

Federal defendants assert two grounds in support of their motion to dismiss: first, that plaintiffs fail to state a claim for relief in the nature of mandamus; and second, that plaintiffs have failed to join Burnside–Ott and DynCorp, both of which are indispensable parties to this action. Because the Court finds the first issue dispositive, it does not reach the second ground for dismissal. Moreover, the parties have submitted affidavits in support of their respective positions. Under Fed.R.Civ.P. 12(c), "[i]f on a motion for judgment on the pleadings matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Therefore, defendants' motions will be treated as motions for summary judgment pursuant to Fed.R. Civ.P. 56.

It is well established that "[m]andamus is an extraordinary remedy to be utilized only in the clearest and most compelling cases." Cartier v. Secretary of State, 506 F.2d 191, 199 (D.C.Cir.1974), cert. denied, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). Under the federal mandamus statute, 28 U.S.C. § 1361, jurisdiction "is limited to compelling a Government official or agency to perform a duty owed to the plaintiff or to make a decision, but not to direct or influence the exercise of discretion of the officer or agency in the making of the decision." U.S.Code & Admin.News, 87th Cong. 2d Sess., 2784–85 (1962). A writ of mandamus will not properly issue unless "(1) a plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." Council of and for the Blind of Delaware County Valley, Inc. v. Regan, 709 F.2d 1521, 1533 (D.C.Cir.1983) (en banc). After careful consideration, the Court concludes that plaintiffs have failed to establish any of the three criteria required for a writ of mandamus and, therefore, such a writ will not properly issue.

First, plaintiffs do not have a clear right under the SCA to the relief sought. The purpose of the SCA was to ensure that service employees working on government contracts are not paid wages below the prevailing wages being paid in the locality by non-government contractors. Thus, § 2 of the Act requires the inclusion of specific provisions establishing minimum wage and fringe benefit levels in contracts entered into by the United States in excess of $2,500 "the principal purpose of which is to furnish services in the United States through the use of service employees." 41 U.S.C. § 351(a). This wage and fringe benefit determination is explicitly directed to the responsibility of the Secretary of Labor "in accordance with prevailing rates for such employees in the locality ..." 41 U.S.C. § 351(a)(1). It is well-established, however, that the SCA does not confer a private right of action, but rather provides for exclusive administrative enforcement with the Secretary of Labor. District Lodge No. 166, Int'l Assoc. of Machinists and Aerospace Workers, AFL–CIO v. TWA Services, Inc., 731 F.2d 711, 716 (11th Cir.1984), cert. denied, 469 U.S. 1209, 105 S.Ct. 1175, 84 L.Ed.2d 324 (1985) (District Lodge); Miscellaneous Service Workers, Etc. v. Philco–Ford Corp., 661 F.2d 776, 779 (9th Cir.1981); Int'l Assoc. of Machinists and Aerospace Workers v. Hodgson, 515 F.2d 373 (D.C.Cir.1975); Berry v. Andrews, 535 F.Supp. 1317, 1318 (M.D.Ala. 1982); Foster v. Parker Transfer Co., 528 F.Supp. 906, 907 (W.D.Pa.1981); Nichols v. Mower's News Service, Inc., 492 F.Supp. 258 (D.Vt.1980).

Plaintiffs assert that it is precisely because they have no private right of action that mandamus is the appropriate vehicle to enforce their rights as service employees under the SCA. Plaintiffs rely on Carpet, Linoleum and Resilient Tile Layers, et al. v. Brown, 656 F.2d 564 (10th Cir.1981) ("Brown"), in which the 10th Circuit held that the SCA imposes legal obligations upon the Secretary of Labor to conduct investigations and enforce its provisions, and that if the Secretary failed to perform these duties a writ of mandamus could properly issue. Defendants, in response, cite District Lodge, supra, in which the 11th Circuit declined to issue a writ of

mandamus to compel the Secretary of Labor to issue retroactive wage determinations. Unlike the 10th Circuit, the *District Lodge* Court found that the plaintiff-union had no clear right to the relief sought and that the SCA did not impose a clear an undisputed duty on the part of the Secretary of Labor nor the contracting agency. *Id.* at 717–18. Thus, there is a split between the Circuits as to whether plaintiffs can obtain enforcement of the SCA through a writ of mandamus.

Upon review of the structure of the SCA and the circumstances of this case, the Court finds the rationale of the *District Lodge* Court the more compelling. As the 11th Circuit stated:

> We are not persuaded that there is a clear right in the plaintiff to the relief sought. As we have previously explicated, the SCA does not confer on the plaintiff a private right of action for its enforcement. It is obvious that plaintiff seeks relief by way of mandamus from the federal defendants solely as means of obtaining back wages from [the contractor]. Lacking such a right directly under the statute, it urges the court to compel the defendants to undertake actions which would indirectly result in the same back wages from [the contractor] that it is precluded from seeking directly. We refuse to blind ourselves to the inequity of granting plaintiff relief which is not an end in itself but is merely a means to an end which plaintiff could not obtain except by this end run. We will not put our imprimatur on such an artful misuse of the extraordinary remedy of mandamus.

*District Lodge*, 731 F.2d at 717.

Moreover, even if this Court were to follow the approach set forth by the 10th

Circuit in *Brown*, mandamus would not be available in this case. Plaintiffs' reliance on *Brown* is simply misplaced. In *Brown*, there was evidence that the Department of Labor and the contracting agencies were not "making reviews adequate to insure compliance with Davis–Bacon labor standards provisions." *Id.* at 565 n. 2. Thus, the *Brown* Court held that "[w]here an agency completely ignores the purpose of the controlling statute, as the defendants did in this case, there cannot be any rational basis in law to support its decision. A reviewing court would be doing less than its duty if it failed to set aside the agency action. By holding an agency accountable to its lawful duties, the administrative process will be vindicated." *Id.* at 568.

The circumstances of the instant case are quite different. Contrary to the situation in *Brown*, here there is no doubt that the Secretary of Labor has taken action to enforce the SCA with respect to the five contracts at issue. With respect to the three TH–57 contracts, the Secretary has enforced the Administrator's wage determination on B–O Contract # 2. Payment of back wages to employees under B–O Contract # 2 has already begun.[15] The Department is currently seeking back wages on the remaining two TH–57 contracts, Dyn-Corp Contract # 1 and B–O Contract # 1. As to the T–2 and T–34/44 contracts (Dyn-Corp Contracts # 2 and # 3 respectively), the Department has issued a wage determination which is currently on appeal to the Deputy Secretary of Labor. However, DynCorp has already distributed $6 million in back wages for fiscal years 1988 and 1989. Clearly, this case does not reflect an instance in which the Secretary has failed to act.[16]

Second, despite plaintiffs' assertions to the contrary, neither the Secretary of La-

---

**15.** Indeed, inasmuch as the Secretary has already acted to enforce B–O Contract # 2, plaintiffs' claims for mandamus with regard to that contract are moot. *See e.g., Gray v. Office of Personnel Management,* 771 F.2d 1504, 1514 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1089, 106 S.Ct. 1478, 89 L.Ed.2d 732 (1986).

**16.** Instead, plaintiffs' real contention seems to be that the Secretary has been dilatory in enforcing the Administrator's wage determinations. This argument is also unpersuasive. The

SCA grants the Secretary wide discretion to act in a manner "necessary and proper to the public interest." 41 U.S.C. § 353(b). In the exercise of this discretion, the Secretary may act or postpone action to the extent consistent with her obligation "to focus scarce resources on key problem areas in order that the basic statutory purpose [of the SCA] could be fulfilled." *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1177 (D.C.Cir.1973) (upholding Administrator's decision not to issue a wage determination). Dyn-

bor nor the Secretary of the Navy have a clearly defined or specific duty under the SCA to enforce retroactive wage determinations or to institute enforcement proceedings in every case. Section 351 of Title 41 merely states that Federal contracts furnishing services through the use of service employees "shall contain" provisions specifying minimum monetary wages as well as provisions specifying fringe benefits as determined by the Secretary to be prevailing for such employees in the locality. 41 U.S.C. § 351(a) and (b). While plaintiffs correctly note that the language of § 351 is mandatory, this section addresses only the required provisions for federal service contracts, not the duty of the Secretary of Labor or the head of the contracting agency to enforce wage determinations retroactively.

Plaintiffs point to no statutory or regulatory language that would support their request for such relief. Section 352, which addresses violations of the SCA, states only that "the Federal agency head or the Secretary is hereby authorized to carry out the provisions of this section." 41 U.S.C. § 352(b). The statute provides no standards for when or under what circumstances the provisions should be enforced. Moreover, under § 353(b):

> [t]he Secretary may provide such reasonable limitations and may make such rules and regulations allowing reasonable variations, tolerances, and exemptions to and from any or all provisions of this chapter (other than section 358 of this title), but only in special circumstances where he determines that such limitation, variation, tolerance or exemption is necessary and proper in the public interest or to avoid the serious impairment of government business, and is in accord with the remedial purpose of this chapter to protect prevailing labor standards.

41 U.S.C. § 353(b).

While the statute authorizes a limited governmental cause of action for recovery of underpayments, it does not mandate such an action:

> If the accrued payments withheld under the terms of the contract are insufficient to reimburse all service employees with respect to whom there has been a failure to pay the compensation required pursuant to this chapter, *the United States may bring action* against the contractor, subcontractor, or any sureties in any court of competent jurisdiction to recover the remaining amount of underpayments. Any sums thus recovered by the United States shall be held in the deposit fund and shall be paid, on order of the Secretary directly to the underpaid employee or employees. Any sum not paid to an employee because of inability to do so within three years shall be covered into the Treasury of the United States as miscellaneous receipts.

41 U.S.C. § 354(b) (emphasis added). Furthermore, the applicable regulations provide only that "[e]nforcement proceedings ... *may* be instituted" by the Department of Labor, 29 C.F.R. § 6.15(a) (emphasis added), and not the contracting agency, 29 C.F.R. § 4.101(b).

Similarly, neither the SCA nor its applicable regulations require the Secretary of Labor or the Secretary of the Navy to withhold contract funds from Burnside–Ott and DynCorp in order to secure back wages as plaintiffs assert. The statute provides in relevant part:

> Any violation of any of the contract stipulations required by section 351(a)(1) or (2) or of section 351(b) of this title shall render the party responsible therefor liable for a sum equal to the amount of any ... underpayment of compensation due to any employee engaged in the performance of such contract. So much of the accrued payment due on the contract of any other contract between the same

Corp's conformance requests for the T–34/44 and T–2 service contracts, currently on appeal to the Deputy Secretary, involve a multitude of job classifications at nine separate locations in six different states. Given the level of complexi-

ty involved in the issuance of a wage determination, the Court does not believe that the delay in this case constitutes a failure to act or a violation of a mandatory duty.

contractor and the Federal Government *may* be withheld as is necessary to pay such employees.

41 U.S.C. § 352(a) (emphasis added). Under the applicable regulation, the contracting officer shall withhold "such sums as an appropriate official of the Department of Labor requests or such sums as the contracting officer decides may be necessary to pay underpaid employees employed by the contractor or subcontractor." 29 C.F.R. § 4.6(i). Thus, the withholding of contract funds is discretionary rather than a "clear, ministerial and non-discriminatory duty." *Kirkland Masonry, Inc. v. Commissioner*, 614 F.2d 532, 533–34 (5th Cir. 1980).

Third, there is an adequate remedy available to plaintiffs under the SCA. Indeed, plaintiffs King and Danielsen have exercised their remedies with respect to B–O Contract # 2. Plaintiffs filed the complaint that initiated DOL's investigation of Burnside–Ott for violations of wage determinations and participated as interested parties pursuant to 29 C.F.R. § 8.11 in the Deputy Secretary's review of the Administrator's conformance decisions. Based on the wage determination for B–O Contract # 2, the Wage and Hour Division is also seeking back wages from both Burnside–Ott and DynCorp for two earlier TH–57 service contracts.

With respect to DynCorp's T–34/44 and T–2 contracts, plaintiffs have not availed themselves of their administrative opportunities. Under the regulations, employees or their authorized representatives may register their agreement or disagreement with proposed conformance actions, 29 C.F.R. § 4.6(b)(2)(ii); and they must be notified of the wage determination provisions, 29 C.F.R. § 4.6(b)(2)(ii) and 4.6(e). Accordingly, plaintiffs could have submitted their views to the Administrator for consideration in her review of DynCorp's conformance proposals for the T–34/44 and T–2 contracts. Instead, plaintiffs waited until almost two years after DynCorp appealed the Administrator's determination to the Deputy Secretary before requesting permission to intervene as interested parties. While this request has been denied, plain-

tiffs King and Danielsen have been permitted to submit their views on the proposed conformance requests to the Deputy Secretary and the parties have been directed to serve plaintiffs and their counsel with all pleadings.

Furthermore, although plaintiffs have no right to participate fully in the administrative proceedings and settlement negotiations, should a settlement be achieved, any new conformance ruling will be subject to appeal "by any aggrieved party" to the Deputy Secretary pursuant to 29 C.F.R. § 8.7(b). Thus, should plaintiffs be dissatisfied with any amended conformance ruling that might be issued as the result of ongoing settlement negotiations, plaintiffs would have a right to seek review before the Deputy Secretary. In the event that the Wage and Hour Division determines that no revision of the Administrator's 1987 conformance ruling is warranted, the Deputy Secretary of Labor will issue a final determination on the merits of DynCorp's appeal. Given these circumstances, plaintiffs clearly have adequate administrative remedies.

For the foregoing reasons, the Court concludes that a writ of mandamus will not properly issue. The Court notes, however, that even if plaintiffs were able to establish the criteria for issuance of a writ of mandamus, it would exercise its discretion to deny plaintiffs' petition based on equitable considerations. "The exercise of the power of mandamus is a matter committed to the sound discretion of the Court, *Whitehouse v. Illinois Cent. R. Co.*, 349 U.S. 366, 75 S.Ct. 845, 99 L.Ed. 1155 (1955), and the remedy is to be restricted to exigent circumstances." *Cartier v. Secretary of State*, 506 F.2d at 199 (footnote omitted). The circumstances of this case militate against the issuance of a writ of mandamus.

As previously discussed, the Secretary has already enforced the wage determination for B–O Contract # 2 and negotiations are currently under way with Burnside–Ott and DynCorp for back wages for the remaining two TH–57 contracts, Burnside–

Ott Contract #1 and DynCorp Contract #1. Plaintiffs also seek to compel the Secretary to enforce the April 3, 1987 wage determination for DynCorp Contracts #2 and #3 although that determination is currently on administrative appeal to the Deputy Secretary. Thus, this case presents neither an instance of agency inaction nor review of a final administrative determination. Instead, plaintiffs seek enforcement of a wage determination that is currently on appeal and ask this Court to insinuate itself in ongoing settlement negotiations. The Secretary has been delegated broad authority to administer the SCA; this Court will not substitute its judgment for that of the Secretary in regard to how pending administrative proceedings can best be resolved.

Accordingly, the Court finds that there are no genuine issues of material fact and that defendants are entitled to judgment as a matter of law.

### ORDER

Upon considering of defendants' motions to dismiss or, in the alternative, for summary judgment, the opposition thereto, the arguments of counsel, and in accordance with the Court's opinion of this date, it is hereby

ORDERED that defendants' motions to dismiss or, in the alternative, for summary judgment be and hereby are granted; and it is further

ORDERED that judgment be and hereby is entered on behalf of the defendants in the above-captioned action.